# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 30, 2011

No. 08-70023

Lyle W. Cayce
Clerk

ELROY CHESTER,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, and STEWART and DENNIS, Circuit Judges.

EDITH H. JONES, Chief Judge:

Petitioner Elroy Chester ("Petitioner") confessed and pled guilty to capital murder and was sentenced to death by a Texas jury. His conviction and sentence were affirmed on direct appeal. He sought post-conviction relief from the Texas courts, alleging that he is mentally retarded, and his execution will therefore be unconstitutional. The Texas trial court and Court of Criminal Appeals determined that Chester was not mentally retarded. Petitioner then applied for a writ of habeas corpus via 28 U.S.C. § 2254. The federal district court denied relief, and he now appeals. The state's legal conclusions neither contradicted nor unreasonably applied federal law, nor were its factual

No. 08-70023

conclusions unreasonable in light of the evidence presented in the state proceedings. *See* 28 U.S.C. § 2254(d)(1)-(2); *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002). We therefore AFFIRM.

## BACKGROUND

In 1997 and 1998, Petitioner embarked on a criminal spree too long and too gruesome to recount here in its full detail. He perpetrated at least five burglaries and five non-lethal assaults; worse, he left in his wake the victims, ranging from ten to eighty-seven years old, of at least five murders and three rapes. Petitioner's career as a serial murderer and rapist culminated in the events of February 6, 1998, when his final victim, Willie Ryman III, discovered Petitioner raping his nieces, and Petitioner shot and killed Ryman.

On that evening, Erin DeLeon was at home alone with her small child. After cutting the telephone wires and tampering with the security light between the garage and house, Petitioner entered the house through the unlocked kitchen door, wearing a ski-mask and gloves. With a gun to the back of Erin's head and her ponytail in his hand, he led her from room to room to retrieve valuables. He then brought her to the living room and ordered her to turn off the lights and draw the blinds. When Claire DeLeon, Erin's sister, returned to the home with her boyfriend Tim, Petitioner demanded their money and jewelry, then ordered them into the bathroom. Alone again with Erin, he forced her to undress, then blindfolded her with duct tape. He then ordered Tim to return, forced him to strip as well, and restrained him with duct tape. Finally he ordered Claire to enter and strip and blindfolded her with duct tape. He raped Erin and forced other sex acts, holding a gun against her head and threatening

2

to "blow her head off" if she resisted.  He repeated this threat when he forced Claire to perform sex acts.

Willie Ryman III, the DeLeon sisters' uncle, arrived at this scene with his girlfriend Marcia Sharp, who stayed in the car while Ryman approached the house.  Petitioner went to the back door and murdered Ryman with a single shot.  He then approached the car, where he began shooting at its locked doors.  He fired two more shots into the car before fleeing the scene.

Chester was quickly implicated and captured.  He confessed to Ryman's murder and led police to the murder weapon.  Although he lied to the police about where it was hidden, and about the fact that it was loaded, apparently trying to mount a violent escape, he did not succeed.  He also confessed to a host of other horrific crimes.  After pleading guilty to capital murder, he was sentenced to death by a Texas jury.  His conviction and sentence were affirmed on direct appeal.  Chester sought post-conviction relief at the state and federal levels on the grounds that he could not be executed because he is mentally retarded.  Relying on the United States Supreme Court's opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the execution of the mentally retarded violates the Eighth Amendment), and on the factors set forth in *Ex Parte Briseno*, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004) (implementing *Atkins*), the use of which our court has repeatedly blessed, the Texas trial court and Texas Court of Criminal Appeals ("TCCA") determined that Chester was not mentally retarded. *Ex parte Chester*, 2007 WL 602607 (Tex. Cr. App. 2007) (unpublished) ("*Chester I*").

The TCCA's detailed and thorough opinion concluded that Chester met two of the three necessary requirements for a finding of mental

No. 08-70023

retardation–significant limitations in intellectual functioning and deficiencies that appeared early in life–but that he did not show "significant deficits in adaptive behavior." *Id.* at \*3-\*4. It cited *Briseno* for the proposition "that courts should use the definitions of mental retardation as stated by the American Association of Mental Retardation" and for a suggested serious of questions which would assist in determining the existence of deficits in adaptive behavior. *Id.* at \*1. It acknowledged that these suggested questions were "intended only to be guidelines for the trial courts" to help them make the mental retardation determination required by *Atkins* "until the Legislature was to . . . establish conclusively both the substantive laws and the procedures that would bring our codes into compliance with the mandate issued by *Atkins*." *Id.* at \*3. The legislature had not intervened, however, and so the *Briseno* factors remained the only legal guidance for lower Texas courts in applying the AARM definition and determining the presence or absence of "significant deficits in adaptive behavior." *Id.*

The TCCA concluded that the trial court's finding that Petitioner failed to demonstrate significant deficits in adaptive behavior was supported by the evidence. The trial court had heard Petitioner's evidence regarding his 1987 "Vineland test," on which he achieved a Vineland Adaptive Behavioral Scales score ("VABS") which would typically indicate mild mental retardation. It also, however, heard evidence regarding Chester's classification during his school years as "learning disabled" (rather than retarded), and found more credible the testimony of a diagnostician who testified that Petitioner's school records were accurate and that a "learning disability" designation does not imply mental retardation. It also noted the planned nature of Petitioner's crimes, both the

4

capital crime and other crimes, in which Petitioner took a great many steps to avoid detection. It noted that he acted independently rather than as an accomplice. The trial court considered conflicting testimony regarding Petitioner's ability to converse coherently, and found more credible the testimony of the expert who testified that Petitioner could converse coherently on a wide range of topics. It found that Petitioner could lie and hide facts to protect himself, as evidenced by his scheme to mislead investigators in order to obtain his loaded gun while in custody. The TCCA therefore affirmed the trial court's factual finding that Petitioner failed to demonstrate significant deficits in adaptive behavior by a preponderance of the evidence. *Id.* at \*9.

Petitioner then applied for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, now alleging (as he must) not only his own mental retardation and the resulting unconstitutionality of his sentence, but that the TCCA's determination was contrary to and an unreasonable application of the holding of *Atkins*, and that the TCCA's decision was based on an unreasonable finding of fact in light of the record before it. The federal district court denied relief, and he appealed.

## DISCUSSION

### I.    AEDPA Review

28 U.S.C. § 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to exceptions in Section 2254(d)(1) and (d)(2). *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). Section 2254(d)(1) contains two overlapping but distinct exceptions: an "unreasonable application" prong and a "contrary to" prong. *See Terry Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 1519 (2000). Federal courts may not grant habeas relief

No. 08-70023

pursuant to § 2254(d)(1) "unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In this context, "clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001) (quoting *Terry Williams*, 529 U.S. at 412, 120 S. Ct. at 1523).

Section 2254(d)(2) excepts from the general bar on relief those cases in which the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A reviewing federal court presumes that the state court's factual findings are sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). This standard is demanding but not insatiable; deference does not by definition preclude relief. *Miller-El*, 545 U.S. at 240, 125 S. Ct. at 2325.

As the Supreme Court has recently reminded, "If [§ 2254(d)'s] standard is difficult to meet, that is because it was meant to be. . . . It preserves authority to issue the writ *where there is no possibility fairminded jurists could disagree* that the state court's decision conflicts with [the Supreme] Court's precedent. It goes no farther." *Harrington,* 131 S. Ct. at 786 (emphasis added) (internal quotation marks and citation omitted).

6

No. 08-70023

Petitioner claims that he is entitled to relief under both 28 U.S.C. § 2254(d)(1) and 28 U.S.C. § 2254(d)(2); he asserts that the state court's adjudication resulted in a decision contrary to and involving an unreasonable application of clearly established federal law *and* was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. We address these claims in turn.

## II.     Section 2254(d)(1) Claims

A state court's judgment falls within the "unreasonable application" exception of § 2254(d)(1) if the state court correctly identifies the governing legal principle from the Supreme Court's decisions, but unreasonably applies it to the facts of the particular case, *Busby*, 359 F.3d at 713, or where it 'extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *LaCaze v. Warden of La. Corr. Inst. for Women*, 645 F.3d 728, 734 (5th Cir. 2011) (quoting *Terry Williams*, 529 U.S. at 407, 413, 120 S. Ct. at 1520, 1523). A federal court cannot reverse the denial of habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; rather, the court must conclude that such application was also unreasonable. *See Horn*, 508 F.3d at 313. In fact, "a condition for obtaining habeas corpus from a federal court" is a showing "that the state court's ruling on the claim being presented . . . was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Harrington*, 131 S. Ct. at 786-87 (emphasis added).

7

No. 08-70023

The first step in determining whether a state court unreasonably applied clearly established federal law is to identify the Supreme Court holding that the state court supposedly unreasonably applied. *See Valdez*, 274 F.3d at 946 (citation omitted). In the instant case the relevant holding is that of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002).

In *Atkins*, the Supreme Court held that "death is not a suitable punishment for a mentally retarded criminal." *Id.* at 321, 122 S. Ct. at 2252. It based this holding on its conclusion that the Eighth Amendment's meaning is to be drawn "from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 311-12, 122 S. Ct. at 2247. To determine what "evolving standards of decency" would dictate in this context, the Court turned to a consideration of "the judgment of legislatures that have addressed the suitability of imposing the death penalty on the mentally retarded[.]" *Id.* at 313, 122 S. Ct. at 2247. After considering these judgments, the Court stated that "a national consensus" had developed against the imposition of the death penalty on the mentally retarded. *Id.* at 316, 122 S. Ct. at 2249.

While it found that there was a national consensus opposing the execution of the mentally retarded, the Court acknowledged that there existed disagreement "in determining which offenders are in fact retarded." *Id.* at 317, 122 S. Ct. at 2250. In addition, it observed that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* Rather than formulating a rule for what subset of those who claimed to be mentally retarded would be ineligible for the death penalty, the Court left to the states "'the task of developing appropriate ways to enforce the constitutional restriction upon

8

[their] execution of sentences.'" *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17, 106 S. Ct. 2595, 2605 (1986)); *see, e.g., Hill v. Humphrey*, ___ F.3d ___, 2011 WL 5841715, at *6, 24 (11th Cir. Nov. 22, 2011) (en banc) (stating that the United States Supreme Court "did not provide definitive procedural or substantive guides for determining when a person" is mentally retarded and holding that the Georgia Supreme Court did not violate any "clearly established" federal law by upholding Georgia's reasonable doubt standard for establishing mental retardation).

Petitioner argues that *Atkins* requires state courts to apply the clinical definitions of mental retardation promulgated by the American Association on Mental Retardation ("AAMR") and American Psychological Assocation ("APA") in evaluating murderers like Petitioner for possible mental retardation. Petitioner relies in particular on footnote 22 of *Atkins*, which noted, in the course of recounting the perceived national consensus, that state definitions of mental retardation "generally conform . . . to the clinical definitions set forth" by the AAMR and APA. *Atkins*, 536 U.S. at 317 n.22, 122 S. Ct. at 2250 n.22. This means the Texas court's analysis unreasonably applied *Atkins*' holding, Petitioner concludes, because he believes the state court analysis does not conform with the AAMR and APA definitions, under which he contends he is retarded.

To evaluate his claim, we turn to the TCCA's decision and its grounding in *Ex parte Briseno*, 135 S.W.3d 1 (2005). Petitioner specifically alleges that the TCCA's reliance on the *Briseno* factors for determining his retardation, rather than the AAMR definition, was an unreasonable application of and contrary to *Atkins*. We disagree. It is impossible to conclude that the state court's analysis

No. 08-70023

here, and its reliance on the factors outlined in *Briseno*, resulted in a decision that was based on an unreasonable application of *Atkins*'s holding.

Before *Atkins*, the Texas legislature determined that to be classified as retarded, a person must prove three facts by a preponderance of the evidence: (a) significantly subaverage general intellectual functioning (proven by showing an IQ below 70) and (b) deficits in adaptive behavior that (c) originated during the developmental period (before age 18). *See* TEX. HEALTH & SAFETY CODE § 591.003(13). This definition is almost identical to the AAMR definition of mental retardation. The Texas Court of Criminal Appeals adopted the AAMR definition of retardation for death penalty cases in *Briseno*. 135 S.W.3d at 8.

The *Briseno* court recognized that the AAMR definition was designed for the purpose of providing social services, not for the purposes of determining whether a person was "so impaired as to fall within the range of mentally retarded offenders about whom there is national consensus." It also recognized that determining deficits in adaptive behavior (the second element) was highly subjective. *Id* at 8. To account for these weaknesses in definition, the *Briseno* court listed seven factors to flesh out the AAMR definition to determine whether the convict falls within *Atkins* so as to be protected against the death penalty. The court held:

> The adaptive behavior criteria [second element] are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder:
>
> • Did those who knew the person best during the developmental stage—his family, friends, teachers,

10

employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

· Has the person formulated plans and carried them through or is his conduct impulsive?

· Does his conduct show leadership or does it show that he is led around by others?

· Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

· Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

· Can the person hide facts or lie effectively in his own or others' interests?

· Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

135 SW.3d 1, 8 (2005). The *Briseno* court, in other words, fashioned these evidentiary factors as a means "of developing appropriate ways to enforce the constitutional restriction" set out in *Atkins*. And on their face, nothing about them contradicts *Atkins*, as they were developed explicitly to comply with *Atkins*.[1]

---

[1] Indeed, the *Briseno* factors obviously evoke *Atkins*'s language which, in turn, evokes the AAMR findings. The first *Briseno* factor, regarding developmental stages, ties to the *Atkins* discussion of the onset of mental retardation before age 18. 536 U.S. at 318. The second and third, regarding impulsive behavior and leadership, tie to the *Atkins* note that the retarded "often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." *Id.* The fourth, regarding rational actions and social propriety, ties to the *Atkins* discussion of "understand[ing] the reactions of others." *Id.* The fifth, regarding focused responses to questions, evokes the *Atkins* discussion of "diminished capacities to understand and process information, to communicate . . . ." *Id.* The sixth, concerning the ability to deceive, seems related to *Atkins*'s mention of "capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning . . . ." *Id.* And the seventh, involving

This court has never cast doubt on this approach. To the contrary, in *Clark v. Quarterman*, this court held that "it is not 'clearly established Federal law as determined by the Supreme Court of the United States' that state court analysis of subaverage intellectual functioning must precisely track the AAMR's recommended approach." 457 F.3d at 445. *Clark* specifically rejected Petitioner's argument that "the Texas courts must apply the approach articulated by the [AAMR], which dictates that IQ examiners account for the appropriate confidence band." *Id.* If Texas need not follow AAMR procedures when determining subaverage intelligence (a relatively objective determination), then it would be senseless to think Texas must follow AAMR procedures when determining deficits in adaptive behavior (a far more subjective determination).

In light of this court's previous treatment of the *Briseno* factors, the Supreme Court's broad holding in *Atkins*, and the irrelevance for the purposes of this inquiry of *Atkins*' dicta (such as footnote 22), we conclude that the application of the *Briseno* factors, even in the absence of specific employment of the AAMR's methodology for determining deficiencies in adaptive behavior, cannot be an "unreasonable application" of *Atkins*' broad holding. *Atkins* clearly did not hold—and Petitioner does not even assert that *Atkins* held—that states must employ the AAMR or APA definitions of mental retardation, let alone that they must employ the same underlying clinical analysis that the AAMR and APA use to determine which patients meet each prong of those organizations' definitions; the absence of such a holding is determinative here.

---

forethought and planning, seems tied to *Atkins*'s mention of action "pursuant to a premeditated plan." *Id.* The *Briseno* factors thus are not arbitrary creations of the Texas judiciary but rather carefully constructed considerations that tie directly to *Atkins*.

This analysis also disposes of Petitioner's overlapping argument that the state court decision was "contrary to" clearly established federal law. A state court's decision is "contrary to" clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby*, 359 F.3d at 713. For the same reasons that employment of the *Briseno* factors to determine adaptive functioning is not an unreasonable application of *Atkins*, the *Briseno* factors themselves do not "contradict" the Supreme Court's holding in *Atkins*. *See Terry Williams*, 529 U.S. at 405, 120 S. Ct. at 1519 (holding state court decision is "contrary" when it "applies a rule that contradicts the governing law set forth in our cases"). This will come as no surprise, since this court has already concluded that the *Briseno* is not "contrary to" *Atkins* in precisely this regard. *See Woods v. Quarterman*, 493 F.3d 580, 587 n.6 (5th Cir. 2007) ("[Petitioner] also argues that *Ex parte Briseno*, relied on by the state habeas court, is contrary to *Atkins* in the way it allows courts to evaluate limitations in adaptive behavior. . . . We find nothing in *Briseno* that is inconsistent with *Atkins* in this regard.").

## III.   Section 2254(d)(2) Claims

With Section 2254(d)(1) unavailable as a means for obtaining federal habeas relief, Petitioner must rely on Section 2254(d)(2), but ultimately in vain. Section 2254(d)(2) excepts from the section's general prohibition on habeas relief cases where the adjudication of the claim in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The TCCA concluded that Petitioner lacked the deficits in adaptive behavior which,

No. 08-70023

combined with his subaverage intellectual ability,[2] would have yielded the characteristics of mental retardation that render him not morally culpable of a capital crime.  Petitioner, on the other hand, argues that the VABS test is dispositive:  Under AAMR guidelines, a person with a VABS score of 57 and an IQ test of 69 usually would be classified as mildly mentally retarded.  Petitioner argues that the *Briseno* factors are not adequate tools to determine whether a person is retarded, and that the TCCA's determination was unreasonable.

We must consider these claims through AEDPA's discriminating lens, noting that "relief may not be granted unless the decision was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  A factual determination made by a state court must be rebutted by clear and convincing evidence."  *Clark*, 457 F.3d at 443.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."  *Miller-El v. Cockrell*, 537 U.S. 322, 340.  As factfinder, the trial court is entitled to deference in credibility determinations.  *Thompson v. Keohane*, 516 U.S. 99, 111, 116 S. Ct. 457, 465 (1995) (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 106 S. Ct. 445, 452 (1985)).  "The question of whether a defendant suffers from mental retardation involves issues of fact, and thus is subject to a presumption of correctness that

---

[2]  Chester's IQ tests have resulted in varying numbers, but most of those numbers would qualify him as mentally retarded under the AAMR definition if coupled with deficits in adaptive behavior.

14

No. 08-70023

must be rebutted by clear and convincing evidence under Section 2254 (e)(1)." *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir 2010).

Accordingly, the state courts' factual determination is presumed correct unless Petitioner rebuts it with clear and convincing evidence. The state trial court relied on three pieces of evidence to determine that Petitioner had no significant deficits in adaptive behavior:

- Expert testimony stated that Chester could communicate clearly, understood current, topical matters, and understood his current legal situation.
- Chester's criminal spree demonstrated the ability to plan, avoid detection, and lie.
- Chester attempted to escape police custody by lying about the location of the hidden murder weapon so that he could grab it.

Petitioner responds that the *Briseno* factors and the state's evidence only focus on recent events (the crimes and recent interviews) as opposed to his full history. Petitioner presented (and represents in his petition) the following evidence:

- The Vineland Adaptive Behavior Survey score of 57. Under AAMR guidelines, this indicates that Chester has deficits in adaptive behavior.
- Expert testimony from Dr. Orloff.
- Testimony from family members that Chester was always "stupid."
- Testimony from school personnel stating that Chester was stupid or retarded.
- Evidence that Chester enrolled and participated in the Mentally Retarded Offenders Program of the Texas Department of Criminal Justice.

15

No. 08-70023

The state trial court found, however, that Petitioner's evidence was unpersuasive or not credible. It discounted the family and school administrator's testimony as indicative only of a learning disability, not retardation. Further, the court found that the family had an incentive to lie. Similarly, it found that Dr. Orloff's testimony was not credible, due to his insufficient exposure to Petitioner and to his lesser credentials. Also, Petitioner's enrollment in the Mentally Retarded Offenders Program was not dispositive because official policy allowed non-retarded convicts to participate.

The Texas Court of Criminal Appeals, while acknowledging that test scores alone might have indicated mental retardation, nevertheless was compelled to find that the evidence supported the trial court's finding that Petitioner is not mentally retarded.[3] Petitioner has offered no "clear and convincing evidence" rebutting the underlying findings or the ultimate finding against mental retardation. While a different factfinder might reach a different conclusion than the state courts, this court only reviews the proceedings to determine whether Petitioner presented clear and convincing evidence that rebuts the presumption that the state trial court's determination was correct. §§ 2254(d)(2), (e)(1). Petitioner failed to do so. Proceedings at the state trial court were a battle between experts with additional testimony and evidence that

_____

[3] Petitioner and the dissent repeatedly claim that the state courts relied "solely" on the *Briseno* factors. The dissent uses this device to assert that the TCCA's decision is "contrary" to *Atkins* legally. But the TCCA opinion (a) states the proper test, (b) states how the AAMR guidelines are informed by the *Briseno* factors, and (c) corrects the state habeas court to confirm that Petitioner's diagnostic tests alone usually indicated a diagnosis of mild mental retardation. The court clearly took the test results into account but found them overborne by evidence and credibility determinations of the trial court. This is not "sole reliance" on improper factors but a faithful application of the principle, acknowledged in *Atkins* itself, that the adaptive functioning component of mental retardation is complex. The dissent would, contrary to *Atkins*, either prevent the state court from applying its expertise here, or confine the state "solely" to diagnostic test results in debatable cases.

16

was inconclusive and invited credibility testing.  It is not this court's place to second-guess the court's credibility determinations.

This analysis conclusively establishes that § 2254(d)(2) avails Petitioner nothing.  But we wish to note a few striking facts from the record that highlight the deficiency of petitioner's claim that the state courts' factual findings regarding deficiencies in adaptive behavior were "unreasonable."  Petitioner carefully cased the house of his victims, located the telephone box, cut the telephone wires, entered through an unlocked door (presumably to avoid the noise that would accompany breaking in), disguised himself in a ski mask, and raped/sodomized the two women inside using *all* the precautions one might expect to see from a clever criminal.

After murdering the girls' uncle, Petitioner fired his gun into the locked doors of the victim's car, apparently reasoning that shooting a lock would break it and cause it to fail.  This was hardly the work of a person with diminished mental capacity; it was problem-solving in response to a crisis.

*Atkins* explains:

[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.  Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated

17

No. 08-70023

<u>plan, and that in group settings they are followers rather than leaders.</u>

536 U.S. at 318, 122 S. Ct. at 2250 (emphasis added).  It seems obvious that Petitioner did not act on an impulse, but rather "pursu[ed] a premeditated plan," acting of his own volition rather than as a "follower[]."  *Id.*  Indeed, he masterminded a sophisticated break-in and dealt with a crisis as it developed. Nothing about this crime suggests Petitioner had difficulties "process[ing] information" or "engag[ing] in logical reasoning."  *Id.*[4]

Of course, the Petitioner's burden here is much higher than simply convincing us that Petitioner is not mentally retarded under *Atkins*.  He has to show by clear and convincing evidence that the state court's determination was *unreasonable*; he falls far short of this burden.

## CONCLUSION

Because the TCCA's decision was not contrary to or an unreasonable application of clearly established federal law, and because it was not based on an unreasonable factual determination in light of the evidence before it, we AFFIRM the district court's denial of habeas relief.

---

[4]  Petitioner's other crimes, fully documented in the state court record and in the TCCA's opinion, further illustrate his cunning criminal calculations.  As an example, the murder of John Sepeda – to which Petitioner confessed – similarly involved the cutting of telephone lines leading into a residence's call box.  And before murdering Cheryl DeLeon, Petitioner  unscrewed the lightbulb in the outdoor security light.  Evidently, Petitioner was able "to abstract from mistakes and learn from experience . . . ."  *Atkins*, 536 U.S. at 318, 122 S. Ct. at 2250.

No. 08-70023

DENNIS, Circuit Judge, dissenting.

I respectfully dissent because the majority opinion affirms a Texas Court of Criminal Appeals (TCCA) death penalty judgment that is contrary to the federal law clearly established by *Atkins v. Virginia*, 536 U.S. 304 (2002): When *Atkins* banned the execution of mentally retarded offenders, it defined mental retardation as generally conforming to the three-part clinical definitions set forth by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA), which were quoted by the Court in *Atkins*. In the present case, the TCCA, instead of applying the "adaptive skill areas" part of that definition, *id.* at 308 n.3, applied its own substantively contrary state law, known as the *"Briseno* factors," in erroneously deciding that Elroy Chester failed to prove that he is mentally retarded. For this reason, I would vacate the federal district court's judgment affirming the TCCA's judgment and remand the case to the federal district court for further proceedings applying the entire correct clinical definition of mental retardation as required by *Atkins*.

In *Atkins*, the Supreme Court held that the Eighth Amendment's prohibition of "cruel and unusual punishments" bars the execution of mentally retarded offenders. The Court reasoned that: (1) there is a national consensus among state legislatures and Congress that the execution of mentally retarded offenders is excessive punishment, *id.* at 314-16; (2) the statutory definitions of "mental retardation" used by states in that national consensus are not identical, but generally conform to, the clinical definitions of "mental retardation" set forth by the AAMR and APA, *id.* at 317 n.22; and (3) the Supreme Court's independent evaluation of the issue revealed no reason for the Court to disagree

19

with the national legislative consensus, *id.* at 321. Based on this rationale, the *Atkins* Court concluded that the Eighth Amendment "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender," *id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)), and that this constitutional restriction protects individuals who "fall within the range of mentally retarded offenders about whom there is a national consensus," *id.* at 317. Further, *Atkins* made plain that the AAMR and APA "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id.* at 318.[1] Thus, in deciding whether a person is mentally retarded and therefore exempt from execution under the Eighth Amendment, a state court must apply each of the three prongs — subaverage intellectual functioning; adaptive functioning limitations; and onset prior to age eighteen — of a definition that generally conforms to the AAMR and APA clinical definitions of "mental retardation."

In *Atkins*, the Court also concluded that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright* with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction

---

[1] Authorities have used the terms "adaptive functioning," "adaptive behavior," and "adaptive skills" to refer to this element of mental retardation. *See* Am. Ass'n on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) [hereinafter AAMR-10] (referring to "limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills"); Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., text rev. 2000) [hereinafter DSM-IV-TR] (referring to "limitations in adaptive functioning in at least two of [eleven] skill areas"); Am. Ass'n on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) [hereinafter AAMR-9] (referring to "limitations in two or more of [ten] adaptive skill areas"). Neither the state nor Chester argues that these terminological differences have any effect on the issues in this appeal. Accordingly, this opinion refers to adaptive functioning, adaptive behavior, and adaptive skills interchangeably.

upon [their] execution of sentences.'" *Id.* at 317 (alterations in original) (citation omitted) (quoting *Ford*, 477 U.S. at 416-17). In so doing, the *Ford* Court made clear that when "the Eighth Amendment bars execution of a category of defendants defined by their mental state[,] [t]he bounds of that category are necessarily governed by federal constitutional law." *Ford*, 477 U.S. at 419 (Powell, J., concurring in part and concurring in the judgment, but speaking for the majority on this point).[2] Thus, by closely following *Ford*, *Atkins* signals clearly that federal constitutional law governs the bounds of the category of mentally retarded individuals who are exempt from execution, although the states, within the confines of due process, may devise *procedures* to govern mental retardation determinations.

Our en banc court and panels have adopted this understanding of *Atkins*. *See Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (en banc) ("*Atkins* specifically reserved to the states the adoption of *procedures* to implement its new constitutional rule . . . ." (emphasis added)); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("[E]ven though *Atkins* left to the states the job of implementing *procedures* for determining who is mentally retarded, 'it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence.'" (emphasis added) (quoting *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007))). Accordingly, the states retain substantial discretion to create appropriate *procedures*, but they may not *substantively* redefine mental retardation so as to permit the execution of those who "fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317.

---

[2] *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("Justice Powell's opinion constitutes 'clearly established' law for purposes of [28 U.S.C.] § 2254 and sets the minimum procedures a State must provide to a prisoner raising a *Ford*-based competency claim.")

No. 08-70023

In *Atkins*, the Supreme Court quoted and referred to the AAMR definition of mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by [(1)] significantly subaverage intellectual functioning, [(2)] existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work[; and (3)] Mental retardation manifests before age 18." 536 U.S. at 309.[3]

The Texas habeas trial court, in considering Chester's habeas petition, did not apply the second element of the AAMR definition to determine if Chester had "related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Instead, the trial court applied the "*Briseno* factors," a series of questions originally suggested by the TCCA in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), which the TCCA itself has described as being "non-diagnostic criteria." *Ex parte Van Alstyne*, 239 S.W.3d 815, 820 (Tex. Crim. App. 2007). Although the factors were initially conceived of as "evidentiary factors which factfinders . . . might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder," *Briseno*, 135 S.W.3d at 8, the TCCA in the present case used the *Briseno* factors as a substantive part of its mental retardation definition, instead of the second prong of the AAMR definition (the AAMR clinical adaptive skills criteria) to determine that Chester had not proved he had adaptive skills deficits, and, therefore, that Chester failed

---

[3] In *Atkins*, the Court also quoted and referred to the similar APA clinical definition of mental retardation. Because the Texas courts have adverted only to the AAMR clinical definition, and the two clinical definitions are substantively the same, I set forth and refer here only to the AAMR clinical definition of mental retardation.

No. 08-70023

to prove he is mentally retarded. *See Ex parte Chester*, No. AP-75037, 2007 WL 602607 (Tex. Crim. App. Feb. 28, 2007) (unpublished).

Chester introduced evidence that he scored under 70 in 4 of the 5 full-scale IQ tests that he has taken since the age of seven years, and scored 57 on the Vineland Adaptive Behavior Survey (VABS), a clinical adaptive functioning test. His evidence showed he has been unable to live or work independently, and his experts and lay witnesses related that he suffered from mild mental retardation and was deficient in several adaptive behavioral areas. The state habeas trial court, which gave no reason for applying the *Briseno* factors to the exclusion of the AAMR adaptive skills criteria and the VABS test results, found that Chester failed to disprove any of the *Briseno* factors, was therefore not limited in adaptive functioning, and thus not mentally retarded for this reason alone. *See Chester*, 2007 WL 602607, at *4. The TCCA affirmed, approving of the trial court's use of the *Briseno* factors to the exclusion of clinical adaptive skills criteria to define mental retardation. *Id.* at *9. The U.S. District Court denied federal habeas relief, on the ground that Chester's application failed under the seventh *Briseno* factor alone. *Chester v. Quarterman*, No. 5:05cv29, 2008 WL 1924245, at *7 (E.D. Tex. Apr. 29, 2008) (unpublished).

The TCCA's decision was contrary to the federal law that was clearly established by the Supreme Court in *Atkins*. Under *Atkins,* state courts must apply a mental retardation definition that generally conforms to all three parts of the clinical AAMR or APA definitions. The TCCA's unique nondiagnostic *Briseno* factors are more constricted than, unrelated to, and substantively contrary to the adaptive deficits criteria identified in the second prongs of the AAMR and APA clinical definitions of mental retardation. Exclusively applying the *Briseno* factors to assess the substantive adaptive skills prong of the mental retardation definition inevitably leads to anomalous and unreliable results, including the execution of offenders who should be classified as mentally

No. 08-70023

retarded and shielded from execution under *Atkins* and the comprehensive clinical definitions quoted therein. In other words, by affirming the Texas courts' erroneous use of the *Briseno* factors in place of the adaptive skills prong of the substantive three-part rule defining mental retardation, the majority allows those state courts to circumvent the constitutional rule of Atkins and to use their more constricted definition of mental retardation to exclude substantial numbers of mentally retarded offenders from protection from execution under the Eighth Amendment.[4] Because the decisions of the TCCA and the federal district court are based on the same error of clear constitutional law, the judgment of the federal district court should be set aside and the case should be remanded to it for further proceedings generally conforming to the clinical definitions of mental retardation as required by *Atkins*.

## I.

The petitioner, Elroy Chester, robbed and raped two young women at gunpoint in their home. When the women's uncle unexpectedly arrived at the house, Chester shot and killed him. He pleaded guilty to the crime of capital murder and was sentenced to death by a Texas jury in 1998. His conviction and sentence were affirmed on direct appeal. Chester then sought post-conviction relief at the state and federal levels on the grounds that he could not be executed because he is mentally retarded.

Chester's federal habeas petition was pending in 2002 when the Supreme Court held in *Atkins* that the Eighth Amendment forbids the execution of

---

[4] At least one study suggests that Texas may be favorably resolving far fewer *Atkins* claims than the national average. As of 2011, of the 81 Texas petitioners whose *Atkins* collateral review claims have been resolved, only 14 (17% of the total) have been successful. This "is significantly lower than the 'national average' success rate of thirty-eight percent identified in a 2008 study of states that had resolved *Atkins* claims." Peggy M. Tobolowsky, *A Different Path Taken: Texas Capital Offenders' Post-*Atkins *Claims of Mental Retardation*, 39 Hastings Const. L.Q. 1, 71 & nn. 203-04, 373-74 (2011) (citing John H. Blume et al., *An Empirical Look at* Atkins v. Virginia *and its Application in Capital Cases*, 76 Tenn. L. Rev. 625, 628-29, 637 (2009)).

mentally retarded offenders. Consequently, Chester's petition was dismissed without prejudice to allow him to renew his claim for state post-conviction relief on the basis of *Atkins*. *Chester v. Cockrell*, No. 02-41152, 62 F. App'x 556 (5th Cir. Feb. 26, 2003).

The TCCA granted Chester leave to file a successive state habeas petition and remanded his case to the state trial court for further proceedings. The trial court held an evidentiary hearing on the *Atkins* claim. In order to prove that he was mentally retarded, under *Atkins*, 536 U.S. 304, and *Briseno,* 135 S.W.3d 1,[5] Chester was required to show by a preponderance of the evidence that he had (1) significantly subaverage general intellectual functioning and (2) related limitations in adaptive functioning, (3) the onset of which had occurred before Chester reached age 18. *Briseno*, 135 S.W.3d at 7. Chester introduced substantial evidence of his mental retardation, including full-scale IQ scores of

---

[5] In *Ex parte Briseno*, the TCCA determined how, in the absence of guidance from the state legislature, Texas courts would procedurally "'enforce the constitutional restriction'" imposed by *Atkins. Briseno*, 135 S.W.3d at 5 (quoting *Atkins*, 536 U.S. at 317). The *Briseno* court held that *Atkins* claims in habeas corpus applications would be decided by judges rather than juries, *id.* at 11, and that the defendant would bear the burden of proof to establish mental retardation by a preponderance of the evidence, *id.* at 12.

In addition to establishing these procedural specifications, the *Briseno* court described "some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *Id.* at 8. They include: (1) "Did those who knew the person best during the developmental stage . . . think he was mentally retarded at that time, and, if so, act in accordance with that determination; (2) "Has the person formulated plans and carried them through or is his conduct impulsive?"; (3) "Does his conduct show leadership or does it show that he is led around by others?"; (4) "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?"; (5) "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?"; (6) "Can the person hide facts or lie effectively in his own or others' interests?"; (7) "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Id.* at 8-9.

As will be discussed more fully below, the *Briseno* court did not initially present these factors as a substitute or alternative definition of mental retardation, but only as additional factors which a court "might also" take into consideration. The *Briseno* factors differ substantially from the adaptive skill areas identified by the AAMR and APA in the clinical definitions of mental retardation. *See infra* Sections IV, VI.A.

69 at age seven, 59 at age twelve, 77 at age thirteen, 69 at age eighteen, and 66 at age twenty-nine and a score of 57 on VABS, a standardized test of adaptive functioning. The Texas Department of Criminal Justice administered one of these IQ tests – on which Chester scored a 69 – and the VABS test in 1987, when Chester was eighteen years old. The State's own expert testified that a person with those test scores would be correctly diagnosed as mentally retarded. In addition, an expert retained by Chester testified that he was indeed mentally retarded. Chester also supplied other evidence tending to show that he suffers from limitations in adaptive functioning. He presented evidence that he was placed in special education early in schooling and admitted into the prison Mentally Retarded Offenders Program (MROP) at approximately age eighteen; achievement testing in prison placed him at third grade levels or below. Two of his sisters testified regarding his adaptive behavior deficits, including his inability to live or work independently. A special education teacher testified regarding his limited abilities at school. One expert diagnosed Chester as mentally retarded based on a review of his records, interviews with Chester, and observation of the State expert's interview with him. Another expert classified him as mildly mentally retarded based on a review of his MROP records.

Chester asserted that he demonstrated deficits regarding the broader conceptual and practical adaptive skill areas, as well as the specific skill areas of communication, work, functional academics, self-direction, and community use. The trial court, adopting the entirety of the prosecution's proposed findings of fact and conclusions of law, concluded that Chester had failed to carry his burden of proof as to either of the first two elements of mental retardation: significantly subaverage general intellectual functioning and related limitations in adaptive functioning. The trial court found that Chester failed to prove that he had adaptive skill deficits but it did not apply the clinical AAMR criteria to make this finding. Instead, it applied the *Briseno* "evidentiary factors" and

concluded that, under the *Briseno* factors, Chester was not limited in adaptive functioning and therefore failed to satisfy the adaptive functioning prong of the tripartite clinical definitions of mental retardation. He therefore was found to be not mentally retarded. If the trial court had applied the clinical adaptive functioning criteria instead, Chester's evidence arguably would have shown he satisfied this prong as well as the other two and that he is mentally retarded.

On appeal, the TCCA partly overruled the trial court's findings and conclusions. *Chester*, 2007 WL 602607. The TCCA held that Chester "has met his burden in regard to demonstrating significant limitations in intellectual functioning," *id.* at *3, and that "there is no dispute as to the third part of the test, that the evidence in favor of a finding of mental retardation occurred and was recorded before the applicant reached the age of eighteen," *id.* at *2. Thus, the TCCA held that Chester had satisfied the first and third prongs of the definition of mental retardation. However, the TCCA denied habeas relief because it concluded that Chester had not "[s]hown [s]ignificant [d]eficits in [a]daptive [b]ehavior" as required by the second prong, *id.* at *4, and he had therefore not carried the burden of showing that he was mentally retarded. In reaching this conclusion, the TCCA did not consider the AAMR's or APA's clinical definitions of mental retardation, but relied exclusively on the factors that had previously been presented in *Briseno* as merely "some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder," *Briseno*, 135 S.W.3d at 8. *See Chester*, 2007 WL 602607, at *4-5.

Chester then filed another federal habeas petition. In that proceeding, the state did not dispute that the evidence of his mental deficits developed before he was eighteen years old or "that Chester suffers from significantly sub-average intellectual functioning." *Chester*, 2008 WL 1924245, at *2. But the district court departed even further than the state courts from the *Atkins* clinical definitions

of mental retardation, expressly holding that a finding as to just one of the seven *Briseno* factors was a sufficient basis for denying an *Atkins* claim: "[A]n affirmative finding as to the seventh and final *Briseno* evidentiary factor is sufficient by itself to uphold a denial of relief in a *habeas corpus* proceeding." *Id.* at *7.[6]

Thus, the district court held that the TCCA's "rejection of [Chester's] mental retardation claim is neither inconsistent with, nor the result of an unreasonable application of, clearly established federal law," and denied habeas relief. *Id.*[7]

Chester now appeals from the district court's order denying habeas relief.

## II.

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Beazley v. Johnson*, 242 F.3d 248, 255 (5th Cir. 2001) (quoting *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998)) (internal quotation marks omitted).[8] I conclude that

---

[6] The seventh *Briseno* evidentiary factor is as follows: "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" *Briseno*, 135 S.W.3d at 8-9.

[7] However, the district court granted Chester a certificate of appealability as to three issues, the first two of which are as follows:

1. The state courts' determination that Mr. Chester is not mentally retarded is unreasonable in light of the evidence presented in the state court and violates the Eighth Amendment by permitting the execution of a mentally retarded defendant.

2. As a way to assess significantly subaverage adaptive functioning, the *Briseno* factors have no basis in the scientific literature and conflict with the accepted definitions of mental retardation recognized and relied on in *Atkins v. Virginia*, making the state courts' exclusive reliance on the *Briseno* factors an unreasonable application of federal law clearly established in *Atkins* and violating the Eighth Amendment by permitting the execution of a mentally retarded defendant.

[8] Because the TCCA was the last state court to address Chester's arguments, we review the decision of that court. *See Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir. 2007) (focusing on whether "the last reasoned state court decision" was "contrary to, [or] an unreasonable application of, federal law"); *see also Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009) ("We

No. 08-70023

Chester has shown that his habeas petitioner should be granted under the "contrary to" clause of AEDPA, 28 U.S.C. § 2254(d)(1). Therefore, I need not consider whether he also satisfies the unreasonable application" clause of AEDPA, 28 U.S.C. § 2254(d)(1), and need not review the district court's findings of fact for clear error.

"Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court may not grant § 2254 habeas relief on any ground previously disposed of on the merits by a state court unless the state decision 'was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.'" *Geiger v. Cain*, 540 F.3d 303, 306-07 (5th Cir. 2008) (alterations in original) (quoting 28 U.S.C. § 2254(d)(1)-(2)); *see also Woods v. Quarterman*, 493 F.3d 580, 584 (5th Cir. 2007). "A state court decision is contrary to clearly established federal law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases,' or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent.' A state court decision involves an unreasonable application of clearly established federal law if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . .'" *Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008) (alterations in

---

review the decision of the last state court to address [the petitioner's] arguments."); *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007) ("[W]e apply the AEDPA standard to . . . the 'last reasoned decision' of the state courts." (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991))); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) ("[T]he decision we review is that of 'the last state court to issue a reasoned opinion on the issue.'" (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005))); *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated a claim, we analyze the last reasoned decision.").

original) (citations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-08 (2000)).

**III.**

In *Atkins*, the Supreme Court early in its opinion set forth in full the generally accepted clinical definitions of mental retardation:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992).
>
> The American Psychiatric Association's [(APA)] definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 308 n.3. The Court then surveyed developments in state and federal law that showed a growing nationwide consensus that mentally retarded defendants should not be executed. *See id.* at 313-16. Beginning with a Georgia law enacted in 1988, the Court counted eighteen states, along with the federal government, which had enacted legislation prohibiting the execution of mentally retarded defendants. *See id.* at 313-15. Furthermore, the Court observed that

No. 08-70023

"even in those States that allow the execution of mentally retarded offenders, the practice is uncommon[:] . . . only five [states] have executed offenders possessing a known IQ less than 70" since 1989. *Id.* at 316.

The Court therefore concluded that "a national consensus has developed against" the execution of mentally retarded defendants. *Id.* "To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. The Court noted that "[t]he [states'] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions" promulgated by the AAMR and the APA. *Id.* at 317 n.22. Thus, the Court's holding that "a national consensus has developed," *id.* at 316, was based on statutes which employed "definitions of mental retardation" that "generally conform to the clinical definitions" quoted above, *id.* at 317 n.22.

As an additional step in its reasoning, the Court undertook an "independent evaluation of the issue." *Id.* at 321. In this step, the Court reasoned that "by definition," people with mental retardation have certain characteristics that make their execution cruel and unusual. *Id.* at 318. These characteristics include "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* Because of these characteristics, "executing the mentally retarded will not measurably further the goal of deterrence," *id.* at 320, and "the lesser culpability of the mentally retarded offender . . . does not merit that form of retribution." *Id.* at 19. Moreover, mentally retarded defendants "face a special risk of wrongful execution" because of "the possibility of false confessions, [and] the lesser ability of mentally retarded defendants to make a persuasive showing

31

of mitigation." *Id.* at 320-21. Therefore, the Court concluded, there was "no reason to disagree with the judgment of 'the legislatures that have recently addressed the matter' and concluded that death is not a suitable punishment for a mentally retarded criminal." *Id.* (quoting *Enmund v. Florida*, 458 U.S. 782, 801 (1982)).

In short, the holding of *Atkins* is that the Eighth Amendment prohibits the execution of individuals who are "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. And the Court described the parameters of that "national consensus" as "generally conform[ing] to the clinical definitions" of mental retardation used by the AAMR and APA. *Id.* at 317 & n.22.

The Court refrained from setting forth procedures for determining whether a particular defendant is "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317. Rather, it declared, "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* (quoting *Ford*, 477 U.S. at 405) (brackets and internal quotation marks omitted).

The *Atkins* Court noted that this was the same "approach" that the Court had previously followed "in *Ford v. Wainwright* with regard to insanity." 536 U.S. at 317. We have previously observed that "*Ford* is instructive" in *Atkins* cases "because of the similarity of the competency and mental retardation issues: both decisions affirmatively limit the class of persons who are death penalty eligible." *Rivera*, 505 F.3d at 358. The Court's opinions in *Atkins* and *Ford* both expressly announced "that the Constitution 'places a substantive restriction on the State's power to take the life'" of certain offenders. *Atkins*, 536 U.S. at 321 (quoting *Ford*, 477 U.S. at 405); *see also Panetti*, 551 U.S. at 957 (same).

No. 08-70023

In *Ford*, Justice Powell's controlling concurring opinion[9] explained that when "the Eighth Amendment bars execution of a category of defendants defined by their mental state[,] [t]he bounds of that category are necessarily governed by federal constitutional law." 477 U.S. at 419. Further, the *Panetti* Court explained that *Ford* "broadly identif[ied]" a "substantive standard for incompetency"; applying this substantive standard, the *Panetti* Court "reject[ed] the standard followed by the Court of Appeals" as being inconsistent with *Ford*. 551 U.S. at 960. Thus, it is clear under both *Ford* and *Panetti* that the definition of incompetency to be executed is a matter of federal substantive constitutional law. Because *Atkins* expressly adopted *Ford*'s approach by announcing "a substantive restriction," 536 U.S. at 321, while giving states procedural room to "develop[] appropriate ways to enforce" that restriction, *id.* at 317, it follows that under *Atkins*, too, the substantive definition of mental retardation for Eighth Amendment purposes is a matter of federal constitutional law.

*Atkins* identified a substantive standard for mental retardation by announcing that states may not execute offenders who are "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. The Court explained that the "national consensus" was based on state-law definitions of mental retardation that "generally conform to the clinical definitions" in the AAMR-9 and DSM-IV-TR, which the Court quoted in full in its opinion. *Id.* at 308 n.3, 317 & n.22. Therefore, in order to "appropriate[ly] . . . enforce the constitutional restriction" imposed by *Atkins*, *id.* at 317 (quoting *Ford*, 477 U.S. at 416), states must apply definitions of mental retardation that "generally conform to the clinical definitions," *id.* at 317 n.22.[10]

---

[9] *See Panetti*, 551 U.S. at 949 ("Justice Powell's opinion [in *Ford*] constitutes 'clearly established law' for purposes of [28 U.S.C.] § 2254 . . . .").

[10] *See Pruitt v. State*, 834 N.E.2d 90, 108 (Ind. 2005) (plurality opinion) ("[T]he Eighth Amendment must have the same content in all United States jurisdictions. . . . Because *Atkins*

No. 08-70023

## IV.

In 2004, the Texas Court of Criminal Appeals issued an opinion declaring how the Texas courts would "enforce the constitutional restriction" under *Atkins*. *Briseno*, 135 S.W.3d at 5 (quoting *Atkins*, 536 U.S. at 317). The court observed that it had "previously employed the definitions of 'mental retardation' set out by the AAMR, and that contained in section 591.003(13) of the Texas Health and Safety Code. Under the AAMR definition, mental retardation is a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. As noted above, the definition under the Texas Health and Safety Code is similar . . . ." *Id.* at 7 (footnotes omitted) (citing, inter alia, AAMR-9, *supra* note 1, at 5).[11] Accordingly, the court concluded that "[u]ntil the Texas Legislature provides an alternate statutory definition of 'mental retardation' for use in capital sentencing, we will follow the AAMR or section 591.003(13) criteria in addressing *Atkins* mental retardation claims." *Id.* at 8.

However, the *Briseno* court expressed some concern with the "adaptive behavior criteria" in the AAMR definition,[12] which it considered to be

explains that state statutes that provided the 'national consensus' against the execution of the mentally retarded 'generally conform' to the AAMR or DSM-IV definitions, we conclude that *Atkins* requires at least general conformity with those definitions, but allows considerable latitude within that range. . . . [W]e think that the prohibition of the execution of the mentally retarded must have some content. There may be some flexibility in determining mental retardation, but we think that if a state's definition of mental retardation were completely at odds with definitions accepted by those with expertise in the field the definition would not satisfy the prohibition.").

[11] Section 591.003(13) of the Texas Health and Safety Code states: "'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."

[12] As previously noted, the AAMR's 1992 definition of mental retardation, as quoted by the Supreme Court in *Atkins*, includes an "adaptive functioning" prong, which requires "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3 (quoting AAMR-9, *supra* note 1, at 5). The AAMR issued a revised definition of mental retardation in 2002, *see* AAMR-10, *supra*

No. 08-70023

"exceedingly subjective." *Id.* at 8. For this reason, the court identified "some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *Id.*[13] Those additional factors are as follows:

- Did those who knew the person best during the developmental stage — his family, friends, teachers, employers, authorities — think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

---

note 1, but the differences between the AAMR's 1992 and 2002 criteria for adaptive functioning or adaptive behavior are not relevant to this appeal.

   [13] The *Briseno* court may have mistakenly assumed that a defendant cannot suffer from both mental retardation and a personality disorder, when in fact individuals often suffer both from mental retardation and personality disorders. "[T]he scientific and clinical definitions emphasize that individuals with mental retardation often have mental disorders as well. No reasonable clinician would have determined that [a defendant] did not have mental retardation merely because the evidence also supported a diagnosis of antisocial personality disorder." John H. Blume et al., *Of* Atkins *and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 692 (2009). The AAMR has authoritatively explained that "[t]he types of mental health disorders are the same in people with and people without mental retardation." AAMR-10, *supra* note 1, at 172. "The prevalence of mental health disorders among individuals with mental retardation is difficult to estimate due to problems in sampling and diagnosis. In general, mental health disorders are much more prevalent in this population compared to the general population." *Id.* Thus, an offender might well be correctly diagnosed with both mental retardation and a personality disorder. *See Lambert v. State*, 126 P.3d 646, 659 (Okla. Crim. App. 2005) ("Mental retardation and mental illness are separate issues. It is possible to be mentally retarded and mentally ill.").

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8-9. Although the TCCA identifies the *Briseno* factors as "adaptive functioning" criteria, the factors bear no resemblance to the AAMR or APA adaptive functioning criteria. The *Briseno* court cited no sources or authorities for the proposition that these "other evidentiary factors" are an accurate or useful way to tell whether a person is genuinely mentally retarded; thus, the factors appear to be wholly the TCCA's own creation. These factors are "non-diagnostic," *Van Alstyne*, 239 S.W.3d at 820, and based on the judges' impressions and assumptions about mental retardation. *See* Blume, *supra* note 13, at 712. The court gave no explanation of how the factors are any less "subjective" than the criteria for adaptive functioning in the AAMR's definition of mental retardation, and they are not based on or drawn from the adaptive functioning skill areas identified by the AAMR or the APA. *See Atkins*, 536 U.S. at 308 n.3; *see also supra* note 1.[14]

After setting forth these evidentiary factors, the TCCA went on to determine the procedural means by which *Atkins* claims in state habeas petitions would be resolved. The court decided that "*Atkins* does not require a jury determination of mental retardation in a post-conviction proceeding," *id.* at 9, and that "[t]he defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded," *id.* at 12 (bold face removed). The court then concluded that the petitioner in that case, Jose Garcia Briseño,

---

[14] It is also unclear *how* the *Briseno* factors could be used as an independent, conclusive way to determine whether a person has significant limitations in adaptive functioning. The AAMR-9, DSM-IV-TR, and AAMR-10 definitions of mental retardation clearly specify how their adaptive functioning criteria are to be used: a person fulfills the criteria if he or she has significant limitations in two of ten, or two of eleven, or one of three, areas. By contrast, the *Briseno* factors do not indicate whether a defendant must negate one factor, or a majority of them, or all seven, or if some factors have more weight than others.

had failed to prove by a preponderance of the evidence that he was mentally retarded. *See id.* at 14-18.

In summary, as relevant here, the *Briseno* court first determined that Texas courts "w[ould] follow the AAMR or section 591.003(13) criteria in addressing Atkins mental retardation claims," and then mentioned seven "other evidentiary factors which factfinders . . . might also focus upon" in determining whether a defendant has the limitations in adaptive behavior that are required for a finding of mental retardation. *Id.* at 8.

## V.

In the present case, the TCCA held that Chester fulfilled two of the three requirements of mental retardation: significantly subaverage intellectual functioning and onset before age 18.[15] It is undisputed in this appeal that Chester meets those requirements. Whether Chester is mentally retarded therefore depends on whether he meets the one remaining requirement: significant limitations in adaptive functioning. In the state habeas proceedings, Chester presented a substantial amount of evidence that tended to prove that he does have significant limitations in adaptive functioning, under the standard clinical definitions of mental retardation to which the national consensus generally conforms, *see Atkins*, 536 U.S. at 317 & n.22. However, the TCCA concluded that Chester is not mentally retarded — a conclusion which was based entirely and exclusively on the TCCA's application of the *Briseno* evidentiary factors. *Chester*, 2007 WL 602607, at *4-5, *9.

Chester provided the state courts with factual evidence and expert testimony indicating that he has significant limitations in adaptive functioning

---

[15] The state trial court, on habeas, adopted the prosecution's proposed findings of fact and conclusions of law in their entirety and thereby held that Chester did not have significantly subaverage intellectual functioning. However, the TCCA observed that "the trial court's findings on the applicant's [IQ] test scores were in conflict with the record" and concluded that Chester "has met his burden in regard to demonstrating significant limitations in intellectual functioning." *Chester*, 2007 WL 602607, at *2-3.

as defined by the AAMR and APA criteria.[16] Notably, he received a score of 57 on the VABS test, which is a clinical method of assessing a person's level of adaptive functioning for the purpose of diagnosing mental retardation.[17] The TCCA observed that "even the State's expert witness acknowledged that a person with a Vineland score of 57, combined with an IQ score of 69 as measured at the same time, would be correctly diagnosed as mildly mentally retarded." *Chester*, 2007 WL 602607, at \*3. These two scores were obtained in 1987 by the Texas Department of Criminal Justice, when Chester was eighteen years old. He was admitted to the department's Mentally Retarded Offender Program at that time. *Id.* That was eleven years before Chester committed the murder for which

---

[16] Chester also argues that the evidence shows that he is mentally retarded under the revised definition promulgated by the AAMR's tenth edition in 2002. *See generally* AAMR-10, *supra* note 1. The questions raised in this appeal do not turn on any differences between the AAMR's 2002 definition and the earlier definitions that the Supreme Court quoted in *Atkins*. Thus, we have no occasion to consider what the result should be if a defendant were to show that he was retarded under one clinical definition but not under another one. *Cf., e.g.*, *Wiley v*, 625 F.3d at 216 n.13 (noting that expert witnesses in that case "indicated that their diagnoses of [the defendant] were the same under both" the AAMR's 1992 and 2002 definitions of the adaptive behavior prong); *In re Hearn*, 418 F.3d 444, 445 (5th Cir. 2005) (citing the AAMR-10 in support of a general definition of mental retardation: "Mental retardation is a disability characterized by three criteria: significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18"); *United States v. Hardy*, 762 F. Supp. 2d 849, 879 (E.D. La. 2010) ("While these differences in definition deserve note, they are ultimately of no consequence to the Court's task. Just as in *Wiley*, . . . the court need not decide which is preferable or correct, because the differences between them are mostly theoretical. Both the APA and AAMR direct clinicians to the same standardized measures of adaptive behavior, such as the Vineland Adaptive Behavior Scales-II . . . .").

[17] Courts, including the TCCA, have often considered VABS test scores to be a valid way of assessing the adaptive functioning prong of mental retardation. *See, e.g.*, *Van Alstyne*, 239 S.W.3d at 820 n.12 ("The Vineland Adaptive Behavior Test is one of the recognized standardized scales for measuring adaptive deficits." (citing *Ex parte Blue*, 230 S.W.3d 151, 165 n.55 (Tex. Crim. App. 2007))).

Moreover, the AAMR favors the use of standardized tests, such as the VABS, as a way to diagnose mental retardation: "For the diagnosis of mental retardation, *significant limitations in adaptive behavior should be established through the use of standardized measures* normed on the general population, including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least two standard deviations below the mean . . . ." AAMR-10, *supra* note 1, at 76 (emphasis added).

he was sentenced to death, and fifteen years before the Supreme Court decided *Atkins*; thus, Chester could not have been faking mental retardation to avoid the death penalty. The TCCA's opinion gave no specific reason for disbelieving or disregarding Chester's VABS score of 57. Neither has the State of Texas given us any reason why the score would not be reliable.

Chester also presented substantial evidence of limitations in at least four out of the AAMR's ten "adaptive skill areas": communication, home living, functional academics, and work. *Atkins*, 536 U.S. at 308 n.3 (quoting AAMR-9, *supra* note 1, at 5).[18] For instance, there was evidence that while growing up, Chester had severe communication difficulties: he spoke in jumbled sentences with misused words and a small vocabulary. His school diagnosed him with a "serious communicative handicap" and provided therapy. Other children called him "stupid" and "retarded." He attended special education classes from third through twelfth grades. All his classes were taught to him at his own academic level, which was never higher than third grade. As an adult, when out of jail, Chester never lived independently; never had a driver's license or a bank account; held only menial jobs; could not read or write well enough to fill out a job application; and could not shop or cook by himself. At eighteen years of age he could read "only small words" and could not name the months of the year, according to the Texas Department of Criminal Justice's assessment which resulted in his being admitted to the MROP.[19]

---

[18] The AAMR and APA definitions of mental retardation require that a person have limitations in only two adaptive skill areas. *Atkins*, 536 U.S. at 308 n.3.

[19] There are disputes about the significance of some of the evidence in the record. For instance, Dr. Edward Gripon, the state's mental retardation expert, testified that the correct diagnosis for someone with an IQ score of 69 and a VABS score of 57 is mental retardation. Yet he also testified that he did not think Chester was mentally retarded.

The state emphasizes that although Chester was placed in the MROP, he was officially classified as having "borderline intellectual functioning" rather than mental retardation. However, Dr. Henry Orloff, a psychologist who was the MROP's director at the time, testified that there was no basis for the diagnosis of borderline intellectual functioning, and that the erroneous diagnosis had been allowed to stand because at that time, it made no practical

No. 08-70023

Despite Chester's VABS test score of 57 — which the state's own expert witness testified was low enough to require a diagnosis of mental retardation — and despite his substantial evidence of adaptive functioning limitations in at least four of the AAMR skill areas, the state courts relied exclusively on the *Briseno* factors to determine that Chester did not meet this requirement of mental retardation. Thus, the state courts did not use the *Briseno* factors in the limited way in which the TCCA's *Briseno* opinion announced that they would be used — as "*other* evidentiary factors" that a court "*might also* focus upon" in addition to the AAMR's clinical definition. 135 S.W.3d at 8 (emphases added).

The TCCA in *Briseno* stated that it would apply the AAMR's 1992 definition of mental retardation, which includes adaptive functioning criteria, in *Atkins* cases. *Id.* The adaptive functioning prong of the AAMR's 1992 definition of mental retardation, as quoted in *Atkins*, is satisfied by a finding of "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3 (quoting AAMR-9, *supra* note 1, at 5) (quotation marks omitted). Similarly, the APA has stated that mentally retarded individuals will have "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills,

difference.

The state also emphasizes that in school, Chester was categorized as being learning disabled rather than mentally retarded. However, Chester counters that a diagnosis of learning disability would be simply invalid in light of his consistently low IQ test results, since a person with a learning disability by definition has a discrepancy between IQ and academic achievement. The DSM-IV-TR explains: "Learning Disorders are diagnosed when the individual's achievement on individually administered, standardized tests in reading, mathematics, or written expression is *substantially below that expected for age, schooling, and level of intelligence.*" DSM-IV-TR, *supra* note 1, at 49 (emphasis added). By contrast, "In Mental Retardation, learning difficulties are *commensurate with* general impairment in *intellectual* functioning." *Id.* at 51 (emphasis added).

work, leisure, health, and safety." *Id.* (quoting DSM-IV-TR, *supra* note 1, at 41 (quotation marks omitted). Yet the TCCA in this case made no attempt whatsoever to determine whether Chester has significant limitations in two or more of those areas of adaptive functioning.[20] The state trial court likewise made no such attempt.

Instead, the TCCA and the state trial court both treated their findings under the *Briseno* factors as if they were a sufficient basis, standing alone, for determining whether a person has significant limitations in adaptive functioning. The courts did not employ — nor did they even mention — any of the clinical definitions or criteria for adaptive functioning limitations. The trial court stated: "This Court's review of evidentiary factors relating to adaptive behavior suggested relevant by the Court of Criminal Appeals in *Ex parte Briseno* weigh conclusively against Applicant's argument that he is mentally retarded." *State v. Chester*, No. 76044-B, slip op. at 25 (Crim. Dist. Ct. Jefferson Cnty., Tex. July 26, 2004). The TCCA stated: "The trial court's findings addressed all seven evidentiary factors listed in *Briseno*, and noted carefully how the applicant had failed to persuade the trial court on each one." *Chester*, 2007 WL 602607, at *4. The TCCA, in effect, dispensed with any measurement of "adaptive functioning" as it is conceived of by the clinical mental retardation definitions and the adaptive functioning criteria contained therein.

The federal district court, in denying Chester habeas relief, likewise made no attempt to determine whether Chester has significant limitations in adaptive functioning according to a rule generally conforming to the clinical definition of mental retardation. The federal district court relied entirely on the seventh

---

[20] Nor did the TCCA make any attempt to apply any other clinical criteria for assessing adaptive functioning, such as the AAMR's 2002 definition, which requires "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills." AAMR-10, *supra* note 1, at 14.

No. 08-70023

*Briseno* factor, and nothing else, as the adaptive functioning test: "an affirmative finding as to the seventh and final *Briseno* evidentiary factor is sufficient by itself to uphold a denial of relief in a *habeas corpus* proceeding." *Chester*, 2008 WL 1924245, at \*7. Thus, not only did the federal district court disregard the AAMR and APA clinical criteria that were used by the *Atkins* Court to define mental retardation, but it disregarded six of the seven *Briseno* factors as well.

## VI.

## A.

The TCCA's decision in the present case is contrary to the clear holding of the Court in *Atkins*. "A state court decision is contrary to clearly established federal law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases . . . .'" *Williams v. Quarterman*, 551 F.3d at 358 (first alteration in original) (quoting *Williams v. Taylor*, 529 U.S. at 405). The TCCA applied a rule of decision using the *Briseno* factors as its exclusive basis for holding that Chester does not have significant limitations in adaptive functioning and that he is therefore not mentally retarded for Eighth Amendment purposes. By so holding, the TCCA adopted and applied a rule of decision that the *Briseno* "other evidentiary factors," standing alone, can be used to determine that an offender does not have significant limitations in adaptive functioning and is therefore not mentally retarded, even when the offender has presented strong evidence that he satisfies all the AAMR or APA clinical criteria for mental retardation.

The TCCA's rule of decision is contrary to *Atkins* because, as explained above, *Atkins* held that the Eighth Amendment imposes a "substantive restriction," 536 U.S. at 321, which prevents states from executing offenders who are "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus," *id.* at 317. In order to "appropriate[ly] . . . enforce th[is] constitutional restriction," states must apply definitions of mental

retardation for Eighth Amendment purposes that reflect the "national consensus" by "generally conform[ing] to the [AAMR and APA] clinical definitions" of mental retardation. *Id.* at 317 & n.22. The rule applied by the TCCA in this case involved a radical departure from general conformity with those clinical definitions of mental retardation. It redefined the adaptive functioning element in such a way that it clearly contradicts and fails to carry out *Atkins*'s mandate to protect from execution all offenders who fall within the national consensus's understanding of mental retardation that generally conforms to the AAMR and APA definitions.

The *Briseno* evidentiary factors, standing alone, cannot be used to accurately determine that a person does not have significant limitations in adaptive functioning according to the national consensus's understanding of mental retardation that the *Atkins* Court identified. This is because the *Briseno* evidentiary factors are substantively very different from, and ask different questions than, the AAMR and APA criteria. For instance, the *Briseno* factors do not consider, and therefore cannot determine, whether a person has significant limitations in the adaptive skill areas of self-care, home living, community use, health and safety, functional academics, leisure, or work. The AAMR-9 and APA criteria or precepts generally conforming to them require only that a person must have significant limitations in two out of ten or eleven adaptive skill areas (as well as showing significantly subaverage intellectual functioning and onset before age 18). The AAMR and APA have noted that mentally retarded individuals have strength areas and that the most appropriate way to identify adaptive functioning deficits is to focus on the individual's limitations. *See* AAMR-10, *supra* note 1, at 8 ("[P]eople with mental retardation are complex human beings who likely have certain gifts as well as limitations . . . . These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive

skill in which they otherwise show an overall limitation."); Blume et al., *supra* note 13, at 706, 710 (quoting AAMR-10, *supra* note 1, at 8); *see also Holladay v. Allen*, 555 F.3d 1346, 1363 (11th Cir. 2009) ("Individuals with mental retardation have strengths and weaknesses, like all individuals. Indeed, the criteria for diagnosis recognizes this by requiring a showing of deficits in only two of ten identified areas of adaptive functioning."); *Lambert*, 126 P.3d at 651 ("Unless a defendant's evidence of particular limitations is specifically contradicted by evidence that he does not have those limitations, then the defendant's burden is met no matter what evidence the State might offer that he has no deficits in other skill areas.").[21]

The *Briseno* factors, used exclusive of the clinical definitions, operate in a significantly different manner. As in this case, if the factfinder concludes that the petitioner met one of the *Briseno* factors even in a limited period of time or situation, the factfinder may then overlook the petitioner's limitations and conclude that the petitioner is not mentally retarded. Thus, a person could easily

---

[21] The AAMR's 2002 definition of mental retardation incorporates the following explanation:

> *Assumption 3:* "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.

AAMR-10, *supra* note 1, at 8. In accordance with this principle, the Oklahoma Court of Criminal Appeals, has explained that evidence regarding an offender's criminal activity is relevant for *Atkins* purposes only insofar as it tends to show that the offender does or does not have limitations in the areas specified by the clinical definitions: "Lambert was required to show . . . that he had limitations in adaptive functioning in two of nine areas . . . . None of the evidence of criminal activity went to any of Lambert's claims of adaptive function limitations. Thus, strictly speaking, none of it was relevant to disprove those claims." *Lambert*, 126 P.3d at 656.

The *Briseno* evidentiary factors, because they focus heavily on isolated instances of a person's behavior, by design are not meant to indicate whether a person meets the standard clinical criteria for mental retardation, which assess an individual's limitations in adaptive functioning based on his or her typical behavior.

have significant limitations in two or more of these areas and yet be determined not to be mentally retarded by a court that relied exclusively on the *Briseno* evidentiary factors. Exclusive reliance on the *Briseno* factors renders evidence of significant limitations meaningless, and is directly contrary to the clinical definitions.

Moreover, at least some of the *Briseno* factors are concerned with aspects of a person's behavior that bear no relation to mental retardation as defined by the AAMR and APA. The second *Briseno* evidentiary factor ("Has the person formulated plans and carried them through or is his conduct impulsive?") describes impulsivity as a sign of mental retardation, but the DSM-IV-TR flatly contradicts this: "Some individuals with Mental Retardation are passive, placid, and dependent, whereas others can be aggressive and impulsive." DSM-IV-TR, *supra* note 1, at 44. The fourth and fifth *Briseno* evidentiary factors ("Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? Does he respond coherently, rationally, and on point to oral and written questions or do his responses wander from subject to subject?") treat rationality and coherent communication as being inconsistent with mental retardation, but the clinical definitions do not indicate that mentally retarded people cannot communicate or behave rationally. On the contrary, the DSM-IV-TR states that people with mild mental retardation — who are "the largest segment (about 85%) of those with the disorder" — "typically develop social and communication skills" and "usually achieve social and vocational skills adequate for minimum self-support." DSM-IV-TR, *supra* note 1, at 43.

Finally, the *Briseno* evidentiary factors also substantially depart from clinical definitions of mental retardation because they focus on isolated instances of a person's behavior rather than on a person's typical, day-to-day level of adaptive functioning. The seventh *Briseno* factor especially focuses on how the

underlying capital crime was committed. This focus on isolated events – and especially on extraordinary events, like a situation in which a person commits murder — runs directly contrary to the clinical definitions' emphasis on day-to-day functioning and on the fact that mentally retarded people, like anyone else, have strengths as well as limitations, in particular circumstances as well as in different skill areas. *See Holladay*, 555 F.3d at 1363 (criticizing the state's expert for her "predominant focus on [the offender's] actions surrounding the crime," which "suggest[ed] that she did not recognize [that people with mental retardation have strengths as well as weaknesses]"); *see also* Caroline Everington & J. Gregory Olley, *Implications of* Atkins v. Virginia*: Issues in Defining and Diagnosing Mental Retardation*, 8 J. Forensic Psychol. Prac., no. 1, 2008, at 1,  11 ("[P]erhaps most important, adaptive behavior is the individual's *typical* performance in his/her community setting. The details of the crime cannot be considered to be a sample of typical behavior.").

As the Supreme Court explained in *Williams v. Taylor*, 529 U.S. at 405 (O'Connor, J., concurring in part and concurring in the judgment, and speaking for the court on this point), "a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."  Further elaborating, the Court stated:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be *substantially different* from the relevant precedent of this Court. . . . A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Id.* (emphasis added).

No. 08-70023

Then, the Court gave two examples to clarify its meaning. First, it explained that:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different."

*Id.* at 405-06 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The Court then provided an example of when a state law is not "contrary to" a clearly established federal law:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent.

*Id.* 406.

Applying the Court's precepts to the present case, it is clear that the TCCA has arrived at a decision that is contrary to *Atkins* because it applied a rule that contradicts the governing law set forth in *Atkins*. Similarly to the first example given in *Williams v. Taylor*, the TCCA rejected Chester's *Atkins* claim on the grounds that he had not established his limitations in adaptive functioning by

proving he was so limited or deficient according to the state-law *Briseno* factors. That decision is "diametrically different," "opposite in character or nature," and "mutually opposed" to the Court's clearly established precedent because the Court held in *Atkins* that Chester need only demonstrate that he has adaptive functioning deficits according to a definition that generally conforms to the AAMR or APA clinical definitions. The *Briseno* factors do not generally conform to, and indeed are "substantially different" from, either the AAMR or APA adaptive functioning criteria. *See Williams v. Taylor*, 529 U.S. at 405.

In other words, this is not a run-of-the-mill state-court decision in which the state court correctly identified the clinical adaptive functioning prong of *Atkins*'s clinical definition of mental retardation and, applying that framework, rejected the prisoner's claim. Instead, the TCCA in this case disregarded the adaptive functioning framework recognized by the Court in *Atkins* and applied the state-court-created *Briseno* factors, which are "diametrically different," "opposite in character or nature," and "mutually opposed" to a definition that generally conforms to the clinical criteria recognized by the Court in *Atkins* for defining mental retardation. Specifically, the TCCA's decision was contrary to *Atkins* itself, where the Court held that a defendant may demonstrate his adaptive functioning deficits by showing limitations in specific skill areas that generally conform to the AAMR or APA clinical mental retardation definitions.

Thus, because the *Briseno* evidentiary factors are substantively different from and contrary to the clinical and diagnostic approaches to determining deficits in adaptive functioning, when they are used as the sole measure of a person's adaptive functioning, rather than concordantly with clinically standardized test results and professionally accepted criteria, they cannot accurately determine whether a person is mentally retarded in accordance with the national consensus's understanding of mental retardation that the Supreme Court identified in *Atkins*.

**B.**

In addition to being contrary to *Atkins*, the TCCA decision in this case did not follow its own earlier opinion in *Briseno* in which it had stated that it would apply the AAMR definition of mental retardation or the similar Texas Health Code § 591.003(13) definition. *Briseno*, 135 S.W.3d at 7-8. The *Briseno* court mentioned some "*other* evidentiary factors" that a court "*might also* focus upon," *id.* at 8 (emphases added), but it did not suggest that those factors could be used as a substitute for substantive clinical criteria in determining whether an offender has significant limitations in adaptive functioning. In this case, the TCCA disregarded the *Atkins* second prong clinical criteria altogether and used *Briseno*'s "other evidentiary factors" as its sole basis for determining that Chester does not have significant limitations in adaptive functioning. The district court took this substantive definition change a step further and held that an affirmative finding of the seventh *Briseno* factor alone can serve as the sole basis for affirming the TCCA.

The three-judge dissent in *Lizcano v. State*, No. AP-75879, 2010 WL 1817772 (Tex. Crim. App. May 5, 2010) (Price, J., concurring and dissenting) (unpublished), made the point forcefully that the TCCA majority, in using or allowing the use of the *Briseno* factors to the exclusion of clinical diagnostic criteria to determine whether a petitioner has satisfied the second prong of the tripartite definition of mental retardation, contradicts both *Atkins* and *Briseno*. In *Lizcano*, as in *Chester*, the factfinder used the *Briseno* factors to the exclusion of clinical diagnostic criteria to reject the petitioner's mental retardation claim and to affirm his death sentence. The dissent acknowledged that there may be "fodder" in the *Briseno* decision to support the *Lizcano* majority's argument that the jury is not "bound by the diagnostic criteria," *id.* at *34, but then correctly argued that such a belief runs contrary to established federal law: "*Atkins* adopted a categorical prohibition. It was founded upon the Supreme Court's

ratification of the prevalent legislative judgment that it is inappropriate to execute mentally retarded offenders. That legislative judgment comprehended mental retardation in essentially the same 'clinical' terms as the AAMR's and APA's diagnostic criteria." *Id.* at \*35.

The *Lizcano* dissent argued that the TCCA was not "justif[ied] [in its] apparent grant of latitude to fact-finders in Texas to adjust the clinical criteria for adaptive deficits to conform to their own normative judgments with respect to which mentally retarded offenders are deserving of the death penalty and which are not." *Id.* In failing to "anchor the fact-finder's decision on the specific diagnostic criteria," *id.*, the majority acted unconstitutionally: "Even if the Supreme Court in *Atkins* 'did not mandate the application of a particular mental health standard for mental retardation, . . . it did recognize the significance of professional standards and framed the constitutional prohibition in medical rather than legal terms.' It would be anomalous to allow the fiat of a fact-finder to undermine the essentially diagnostic character of the inquiry. We should not . . . permit a [fact-finder] capriciously to deviate from the specific diagnostic criteria in order to conform to its own normative, unnecessarily subjective, and certainly unscientific judgment regarding who deserves the death penalty." *Id.* (first alteration in original) (footnotes omitted).

In summary, in order to determine whether Chester is mentally retarded and protected from execution under *Atkins*, the state courts were constitutionally obligated to employ a definition of mental retardation that would identify and protect the class of offenders covered by *Atkins*'s "substantive restriction on the State's power to take [a] life" — namely, those offenders who are "so impaired as to fall within the range of offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 321. However, in their adjudication of Chester's claim, the state courts transformed the *Briseno* evidentiary factors into a stand-alone substantive test for the adaptive functioning prong of the

mental retardation definition, a test that does not "generally conform to the clinical definitions," *id.* at 317 n.22, and hence cannot accurately determine whether an offender falls within the class that is protected by *Atkins*. The state courts did this even though Chester presented standardized test scores and other evidence tending to show that he satisfied the clinical criteria for adaptive functioning limitations (as well as the other two prongs of mental retardation, which he has undisputedly established). Therefore, the state courts' decision that Chester is not mentally retarded was "contrary to" *Atkins*, under 28 U.S.C. § 2254(d)(1), because the state court applied a rule that contradicted the governing law clearly set forth in *Atkins*.

## VII.

The issue presented by this case is not whether a state or federal court must *strictly* apply the AAMR or APA clinical definitions of mental retardation in deciding *Atkins* claims — as the majority suggests — but rather whether a court must apply a definition that generally conforms to those clinical definitions, or whether a court can disregard or depart freely from them and make up its own unscientific and non-clinical definition of mental retardation that contradicts the definitions to which the national consensus generally conforms. *Atkins* requires that states apply a definition that "generally conforms" to the AAMR and APA clinical definitions and diagnostic assessments of mental retardation, which the national consensus has embraced. In this case, the TCCA utilized parts of the tripartite definition of mental retardation, but its definition of the adaptive functioning prong does not generally conform to the national consensus's definition of this prong and in fact departs substantially from the nationally accepted criteria for determining whether a petitioner has adaptive functioning deficits.

The majority erroneously concludes that the *Briseno* factors provide a constitutionally acceptable means of limiting the class of defendants who are

death eligible, and that Chester's claim must fail. There is a vast distance between a holding requiring strict adherence to a clinical definition and a holding that would allow states to develop their own definitions of mental retardation without regard for the clinical definitions or the national consensus. While the former is not required by *Atkins*, the latter clearly falls outside *Atkins*'s constitutional bounds because *Atkins* requires that the state's definition "generally conform" to the clinical definitions that the national consensus relied upon in narrowing the class of death eligible defendants to exclude mentally retarded defendants.

The *Atkins* holding clearly prohibits the execution of mentally retarded defendants. Although as in *Ford,* the Supreme Court left to the states the task of enforcing this restriction, *Atkins*, 536 U.S. at 317, "[t]he bounds of that category are necessarily governed by federal constitutional law." *Ford*, 477 U.S. at 419 (Powell, J., concurring in part and concurring in the judgment, and speaking for the majority on this point). The prohibition becomes meaningless unless it is moored to a generally agreed upon definition of "mental retardation." Yet this is what the majority does: it releases the definition from its moorings. The TCCA should not be permitted to circumvent *Atkins*'s constitutional prohibition by totally supplanting the definition of adaptive functioning that, prior to *Briseno*, had been utilized by Texas courts and which "generally conform[ed]" both with the AAMR clinical definition and with the national consensus that had developed around the AAMR and APA definitions.

The majority does not attempt to argue that the *Briseno* factors, standing alone, fall within the national consensus. Indeed, the opinion seems to suggest that states are empowered to ignore the national consensus. This national consensus tracks the "'evolving standards of decency that mark the progress of a maturing society,'" which underlies Eighth Amendment jurisprudence. *Atkins*, 536 U.S. at 312 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). States may not

ignore it in favor of their own restrictions that would allow for the execution of individuals that the national consensus has decided should not be executed. This is clear from the text of *Atkins*, which left to the states only "'the task of developing appropriate ways to *enforce* the constitutional restriction upon [their] execution of sentences.'" *Atkins*, 536 U.S. at 317 (alteration in original) (emphasis added) (quoting *Ford*, 477 U.S. at 416-17). It does not give states the power to define what the constitutional restriction is; that had already been determined by the national consensus upon which the *Atkins* Court based its holding.

In this case, the TCCA used the *Briseno* factors as a substitute for the clinical definition that Texas had previously pledged to follow and to which the national consensus generally conforms. It presents a "scientifically unsound and *Atkins*-violative assessment[] of adaptive functioning." Blume, *supra* note 13, at 706. Moreover, standing alone, the *Briseno* factors turn on its head the consensus's approach to determining whether the petitioner has significant limitations in adaptive functioning. The AAMR and APA correctly assess adaptive functioning by analyzing the petitioner's limitations. According to the AAMR, a person who is deficient in two out of the ten AAMR adaptive skill areas may be categorized as having significant limitations in adaptive functioning. The *Briseno* factors function in the opposite manner. According to the district court below, which the majority today affirms, the fact finder may find that a petitioner is not mentally retarded merely because he meets one of the seven *Briseno* factors. Moreover, several of the *Briseno* factors are markedly different from the clinical adaptive skill areas, and several are based on a person's actions in a single moment instead of over a person's lifetime. In other words, if the *Briseno* factors, standing alone, are allowed to replace an analysis that generally conforms to the clinical definitions, a single area or moment of strength can discount substantive evidence of significant limitations in numerous areas of

adaptive functioning. *See* Blume, *supra* note 13, at 717-18. Furthermore, the TCCA, in developing the *Briseno* factors, did not conduct an assessment of the national consensus or draw from the clinical definitions of mental retardation around which the national consensus has coalesced. The factors are unmoored from the national consensus's general understanding of what constitutes mental retardation. Used alone, these factors may determine that a subclass of persons protected by *Atkins*'s holding are, indeed, death eligible in Texas. The use of the *Briseno* factors in the present case therefore is clearly "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## VIII.

Chester's claim that he is mentally retarded must be adjudicated in a manner that is consistent with *Atkins*. The TCCA's adjudication of Chester's claim was contrary to the law that *Atkins* clearly established. *See Williams v. Quarterman*, 551 F.3d at 358 (5th Cir. 2008) ("A state court decision is contrary to clearly established federal law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases . . . .'" (first alteration in original) (quoting *Williams v. Taylor*, 529 U.S. at 405)). Accordingly, I would vacate the judgment of the district court and remand this case to allow the district court to determine, not inconsistently with this opinion and pursuant to the federal law clearly established by the Supreme Court in *Atkins*, whether Chester is mentally retarded under a definition of mental retardation that "generally conform[s] to the clinical definitions" set forth in *Atkins*, 536 U.S. at 317 n.22, and thus "fall[s] within the range of mentally retarded offenders about whom there is a national consensus," *id.* at 317, and hence is protected from execution by the Eighth Amendment.